FILED
CLERK, U.S. DISTRICT COURT
FILED
NOV - 7 2001
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

___ Priority
✓ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3
___ Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NISSAN MOTOR CO., LTD., et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>NISSAN COMPUTER CORPORATION,<br><br>　　　　　Defendant. | Case No. CV 99-12980 DDP (Mcx)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISQUALIFY EXPERT — DR. GERALD FORD**<br><br>[Motion filed on October 1, 2001] |

　　　This matter comes before the Court on the defendant's motion to disqualify one of the plaintiffs' two expert witnesses. After reviewing and considering the materials submitted by the parties, the Court adopts the following order.

I.　**BACKGROUND**[1]

　　　Because the parties and the Court are familiar with the history of this case, it is not necessary to repeat the factual background of this dispute at length. Concisely, the dispute concerns the use of the Internet domain names "nissan.com" and

---

[1] The following facts are undisputed unless otherwise noted.

251

"nissan.net". One of the issues involved is the famousness of the "NISSAN" trademark.

In January and October 2000, Neil D. Greenstein ("Mr. Greenstein"), counsel for the defendant Nissan Computer Corporation (the "defendant"), contacted and communicated with Dr. Gerald L. Ford ("Dr. Ford") regarding the possible retention of Dr. Ford as an expert for the defendant in this matter. Dr. Ford declined the defendant's offer; he has never been retained by the defendant in this matter.[2]

In November 2000, counsel for the plaintiffs, Nissan Motor Co., Ltd. and Nissan North America, Inc. (collectively, the "plaintiffs"), contacted Dr. Ford to discuss his retention on two trademark matters, including the instant matter. Dr. Ford accepted the plaintiffs' offer of retention. On January 4, 2001, counsel for the plaintiffs sent Dr. Ford various relevant documents for his review. On January 7, 2001, Dr. Ford began his review of the file and work on this matter.

On March 31, 2001, the plaintiffs served Dr. Ford's Rule 26 Expert Disclosure Report on the defendant. According to the defendant, it "was shocked to receive Nissan Motor's disclosure which included Dr. Ford." (Def.'s Mot. at 1:25-26.) Mr. Greenstein elaborated,

> When I reviewed this disclosure, I became concerned because I had been in contact with Dr. Ford for the purpose of discussing a possible survey by Dr. Ford, and for the possibility of retaining him as an [sic] survey expert to create and conduct a market survey designed to "test" the alleged famousness of the term NISSAN during

---

[2]The parties dispute Dr. Ford's reasons for declining the defendant's offer of retention. Why Dr. Ford declined retention, however, is not relevant to the instant motion.

2

1       the relevant time period, or if not possible, to testify
2       on the issues.

3 (Greenstein Mot. Decl. ¶ 3.) On October 1, 2001 — six months after
4 receiving the plaintiffs' disclosure revealing their retention of
5 Dr. Ford — the defendant filed the instant motion to disqualify Dr.
6 Ford from "acting on behalf of plaintiffs, from providing
7 information to plaintiffs' experts and from testifying at trial."
8 (Def.'s Mot. at 1:4-5.)

10 **II. ANALYSIS**
11     **A. LEGAL STANDARD**
12     "Federal courts have the inherent power to disqualify experts,
13 although cases that grant disqualification are rare." Koch Ref.
14 Co. v. Jennifer L. Boudreaux M/V, 85 F.3d 1178, 1181 (5th Cir.
15 1996) (citing Campbell Ind. v. M/V Gemini, 619 F.2d 24, 27 (9th
16 Cir. 1980); English Feedlot, Inc. v. Norden Labs., Inc., 833 F.
17 Supp. 1498, 1501 (D. Col. 1993)). As one district court has
18 explained, courts are empowered to disqualify an expert: "both for
19 the purpose of protecting various privileges which may be breached
20 in some fashion if an expert is permitted to change sides during
21 litigation, or as part of the court's inherent power to preserve
22 the public confidence in the fairness and integrity of the judicial
23 proceedings." Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271,
24 277-78 (S.D. Ohio 1988) (internal citations omitted).
25     In resolving motions to disqualify an expert based on a prior
26 relationship with a party, "courts have rejected a 'bright-line'
27 rule and have adopted" a two-step inquiry. See Koch Ref., 85 F.3d
28 at 1181; see also English Feedlot, 833 F. Supp. at 1502; Mayer v.

Dell, 139 F.R.D. 1, 3 (D.D.C. 1991); <u>Wang Labs., Inc. v. Toshiba Corp.</u>, 762 F. Supp. 1246, 1248 (E.D. Va. 1991). First, courts consider whether it was objectively reasonable for the first party to believe that a confidential relationship existed. <u>See, e.g.</u>, <u>Topps Co. v. Productos Stani S.A.I.C.</u>, No. 99 Civ. 9437 (CSH)(GWG), 2001 WL 406193, *1 (S.D.N.Y. Apr. 20, 2001). Second, courts determine whether the first party actually disclosed confidential information to the expert. <u>See, e.g., id.</u>

> If the answers to both inquiries are affirmative, a court should disqualify the expert. However, disqualification is likely inappropriate if either inquiry yields a negative response. Thus, generally, disqualification "should not occur where a confidential relationship existed but no privileged information was communicated or alternatively, where no confidential relationship existed but privileged information was nonetheless disclosed."

<u>Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, L.L.C.</u>, 202 F.R.D. 426, 429 (E.D. Pa. 2001) (quoting <u>In re Orthopedic Bone Screw Prods. Liab. Litig.</u>, No. MDL 1014, 1995 WL 925673, *3 (E.D. Pa. May 5, 1995)) (internal citations omitted).

"The party seeking disqualification bears the burden of proving these elements." <u>Koch Ref.</u>, 85 F.3d at 1181; <u>see also</u> <u>Topps</u>, 2001 WL 406193, at *1. "[T]he party requesting disqualification may not meet its burden with 'mere conclusory or *ipse dixit* assertions.'" <u>Green, Tweed</u>, 202 F.R.D. at 429 (quoting <u>Orthopedic Bone Screw Prods.</u>, 1995 WL 925673, at *6).[3]

---

[3] <u>Black's Law Dictionary</u> defines *ipse dixit* as follows: "He himself said it; a bare assertion resting on the authority of an individual." <u>Black's Law Dictionary</u> 828 (6th ed. 1990).

4

## B. APPLICATION

The defendant argues that Dr. Ford must be disqualified from serving as an expert for the plaintiffs in this case because, in January and October 2000 – prior to the plaintiffs' March 31, 2001 disclosure of Dr. Ford as the plaintiffs' expert – counsel for the defendant spoke to Dr. Ford about his possible retention as an expert for the defendant, and, during the course of at least one of those conversations, "disclosed confidential information relating to Nissan Computer's case strategies and theories." (Def.'s Mot. at 1:22-23; Def.'s Reply at 3:2-27.)

In support, the defendant offers declarations from Mr. Greenstein, which outline the seven telephone communications between Mr. Greenstein and Dr. Ford. (See generally Greenstein Mot. Decl.; Greenstein Reply Decl.)[4] According to Mr. Greenstein, on January 13, 2000 at 6:35 p.m., following his receipt of the plaintiffs' expert survey by Deborah E. Jay in support of their motion for preliminary injunction, he telephoned Dr. Ford to discuss Jay's survey and "spoke briefly" – approximately 2-½ minutes – "about the case at that time." (Greenstein Reply Decl. ¶¶ 5, 6.) On January 14, 2000 at 9:40 a.m., Dr. Ford telephoned Mr. Greenstein and left a message with his secretary. (Id. ¶ 7.) Later that day, at 11:28 a.m., Mr. Greenstein returned Dr. Ford's call and, according to Mr. Greenstein, was told by Dr. Ford that he

---

[4] Mr. Greenstein's initial declaration is less specific than his reply declaration as to the dates, times, and durations of his various communications with Dr. Ford. The reply declaration also includes references to telephone bills and computerized telephone messaging records, attached as exhibits to the declaration, that corroborate Mr. Greenstein's testimony about the specific dates, times, and durations of his various communications with Dr. Ford.

5

was unable to assist the defendant "because of his time constraints." (Id. ¶ 8.)

On October 5, 2000 at 2:02 p.m., Mr. Greenstein again spoke with Dr. Ford, this time "for just over 2 minutes. The purpose of this call was to retain him as a trial witness." (Id. ¶ 10.) On October 11, 2000, at 2:43 p.m., Mr. Greenstein called Dr. Ford, but, unable to reach him, "left a message requesting his return call." (Id. ¶ 11.) Later that day, at 4:57 p.m., Dr. Ford called Mr. Greenstein back and left a message with Mr. Greenstein's secretary. (Id. ¶ 12.) Even later, at 5:22 p.m., Mr. Greenstein returned Dr. Ford's message, and the two spoke for over 30 minutes. (Id. ¶ 13.) According to Mr. Greenstein, during this final and most lengthy conversation,

> I explained our position as to why Nissan Computer was not liable to Nissan Motors, the relevant time period that the survey had to address, and Nissan Computer's understanding of the third party usage of the term NISSAN. We discussed substantive law and interpretations of cases in the field. We also discussed whether and how potential surveys could or could not address the issues in this case.

(Greenstein Reply Decl. ¶ 13.) Mr. Greenstein asserts that "[d]uring the course of my conversations with Dr. Ford, I understood and believed that a confidential relationship had been established and I spoke in accordance with that understanding." (Greenstein Mot. Decl. ¶ 5.)

There is a significant problem, however, with Mr. Greenstein's assertions: Dr. Ford either does not recall the communications or does not agree with Mr. Greenstein's characterizations of them. In Dr. Ford's declaration, filed with the plaintiffs' opposition papers, he states that he has "no recollection, whatsoever, of any

6

discussions with Mr. Greenstein regarding the pending matter on or about January 14, 2000." (Ford Decl. ¶ 4.) Dr. Ford also states that his general "practice is to open a file on any new matter in which I have even initial discussions with counsel about potentially working on a matter." (Id.) With respect to this matter, no "such file exists" in his records. (Id.) Moreover, Dr. Ford states that, in 1994, when Dr. Ford agreed to work with Mr. Greenstein on a different matter, Mr. Greenstein sent Dr. Ford a letter confirming Dr. Ford's retention. (Id.) According to Dr. Ford, "if the telephone conversation on or about January 14, 2000, established the basis for our confidential relationship, I would have, if I understood such a relationship existed, opened a file regarding the matter, and I assume Mr. Greenstein, as he did in the [other] matter, would have sent a communication confirming such a relationship." (Id.)

Dr. Ford does "recall speaking to Mr. Greenstein in late September or early October, 2000," but vehemently denies Mr. Greenstein's assertions that they discussed the substance of this case. (Id. ¶¶ 5, 6.) According to Dr. Ford,

> [a]t no time, in my brief discussion with Mr. Greenstein, did he disclose to me Defendant's position, defenses, strategies, or Defendant's theory of the case. Similarly, at no time did I discuss with Mr. Greenstein either the substantive case law or interpretations of cases related to the Nissan matter or any surveys related to this matter.

(Id. ¶ 6.)

7

### 1. WHETHER THE EVIDENCE SUPPORTS A FINDING THAT CONFIDENTIAL INFORMATION WAS DISCLOSED[5]

Because the defendant has not provided any evidence to conclusively rebut Dr. Ford's disagreements with Mr. Greenstein's assertions about the contents of their discussions, the Court cannot conclude that a preponderance of the evidence supports a finding that confidential information was disclosed. Faced with such an evidentiary deadlock of competing *ipse dixit* statements, the Court must conclude that the defendant, as the party bearing the burden of proving that disqualification is warranted, has not satisfied its burden. See Green, Tweed, 202 F.R.D. at 429 (*ipse dixit* assertions insufficient to carry the moving party's burden); see also Mayer, 139 F.R.D. at 2-3 (finding disqualification not warranted where the declaration from the defendant's expert denies allegation in the declaration of the plaintiff's counsel that meeting between the two was conducted subject to express oral agreement that all matters discussed were confidential).

---

[5] Although courts apply a "two-step inquiry" to motions to disqualify experts, Green, Tweed, 202 F.R.D. at 428, because a negative answer to either of the two prongs of the inquiry precludes disqualification, see id. at 429, the Court need not address one prong before addressing the other. Accordingly, for ease of explanation, the Court will first address whether the evidence supports a finding that confidential information was disclosed, and then address, assuming confidential information was disclosed, whether Mr. Greenstein's belief that he had a confidential relationship with Dr. Ford was objectively reasonable.

## 2. WHETHER MR. GREENSTEIN'S BELIEF THAT HE HAD A CONFIDENTIAL RELATIONSHIP WITH DR. FORD WAS OBJECTIVELY REASONABLE

Even if the Court were to assume the truth of Mr. Greenstein's assertions about the content of his communications with Dr. Ford, disqualification would not be warranted here because Mr. Greenstein's assertions do not compel a finding that he had an reasonable expectation of a confidential relationship. "[A]bsent compelling equitable reasons to the contrary, any substantial ambiguity regarding whether there is a confidential relationship between an attorney and an expert should be resolved against the attorney seeking to invoke the relationship." Wyatt v. Hanan, 871 F. Supp. 415, 420 (M.D. Ala. 1994). This is because

> lawyers are in the best position to development [sic] mechanisms to assure that both they and the expert have a clear and unambiguous understanding that a confidential relationship has been created. They are the "repeat players," the ones who will continually face the problem. . . . [L]awyers have the legal background and experience enabling them to anticipate possible problems in the future. They know the rules by which everyone must play. Therefore, because lawyers seeking to invoke the confidential relationship have the knowledge, experience, and the ability to avoid the conflict, it is appropriate that the consequences for failing to take the necessary precautionary measures should fall upon them.

Id. at 420-21. Put more succinctly, "[l]awyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended." Wang Labs., 762 F. Supp. at 1248 (finding disqualification warranted where counsel sent expert an initial letter, various documents relevant to the patent infringement action, a lengthy and detailed memorandum outlining the patents' prosecution history and a second letter labeled "CONFIDENTIAL ATTORNEY – WORK PRODUCT" that outlined the

9

defendant's potential defenses to the plaintiff's suit; and where expert composed a three-and-one-half page single-spaced typed report on the patents' validity and invoiced counsel for $1,540.00).

One district court has articulated a recipe for making clear to consultants that a retention and a confidential relationship are desired and intended.

> First, a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing. The writing should define clearly the consultant's confidentiality obligation. If a consultant does not want to be bound by such confidentiality requirement, he should decline the engagement. Similarly, counsel seeking to retain a consultant should inquire specifically whether the consultant's past employment presents any confidentiality problems.

English Feedlot, 833 F. Supp. at 1505 (citing Wang Labs., 762 F. Supp. at 1250). Even if Mr. Greenstein's characterizations of his communications with Dr. Ford are assumed to be true, it is undisputed that Mr. Greenstein did not adhere to this recipe. Mr. Greenstein sent Dr. Ford no letters: no letter before their conversations confirming his intention to retain Dr. Ford and no letter after their conversations confirming the contents of their conversations.

Nevertheless, the Court notes that the absence of such writings does not preclude a finding that attorneys reasonably considered a pre-retention interview to be confidential. See Shadow Traffic Network v. Superior Court, 24 Cal. App. 4th 1067, 1080 (1994). In Shadow Traffic, four members of Deloitte & Touche, a big-six accounting firm, met with attorneys for the plaintiff to discuss possible retention of individuals from Deloitte & Touche as

10

1  experts. See id. at 1071. The meeting lasted approximately one
2  hour. See id. Three weeks later, the defendant retained one of
3  the Deloitte & Touche individuals as an expert. See id. at 1072.
4  On the plaintiff's motion to dismiss the defendant's counsel on the
5  basis that he had improperly gained access to privileged
6  information, the plaintiff's attorneys submitted declarations to
7  the court stating that they told the Deloitte & Touche
8  representatives during the meeting that "everything we would be
9  discussing was confidential, and that they should not disclose the
10 discussed matters to anybody." Id. at 1073. Moreover, according
11 to the declarations, none of the representatives objected to this
12 statement and one of them affirmatively agreed that everything
13 would be confidential. See id.
14     Notably, Shadow Traffic presents a stronger argument for the
15 reasonable expectation of a confidential relationship than the
16 facts of the instant case. Even assuming Mr. Greenstein's
17 assertions to be true, he makes no assertion that he orally
18 communicated to Dr. Ford the confidential nature of their alleged
19 communications – much less, that Dr. Ford agreed to be bound by
20 confidentiality.
21     Nikkal Indus., Ltd. v. Salton, Inc., 689 F. Supp. 187
22 (S.D.N.Y. 1988), a case relied on by the plaintiffs here, also
23 discusses disqualification of experts in the context of pre-
24 retention interviews. In Nikkal, the plaintiff's attorney
25 contacted a market research expert to determine whether the expert
26 would be interested in becoming employed by the plaintiff as an
27 expert witness. See id. at 188. The plaintiff's attorney agreed
28 to pay the expert for his attendance at the meeting and forwarded

11

various publicly available documents to him. See id. At the meeting at the office of the plaintiff's counsel, counsel furnished the expert with information about the plaintiff useful in conducting a market survey, gave the expert information concerning marketing and sales methods that counsel considered privileged, and displayed some of the contested evidence. See id. The expert advised the plaintiff on how to perform a market research and provided the plaintiff with a cost estimate for the survey. See id. The remainder of the meeting involved discussions of the essential issues of the case, and potential techniques for conducting a market survey. See id. The meeting lasted approximately ninety minutes. See id. The expert eventually declined payment for his attendance at the meeting, and after learning that the plaintiff had retained another expert, agreed to work for the defendant as an expert. See id. at 189. His primary responsibility for the defendant was to evaluate the reliability of any market research techniques offered at trial by the plaintiff. See id. On the defendant's motion to disqualify the expert, the court held that disqualification was not warranted. See id. at 192.

Although Nikkal — a 1988 decision — did not apply the two-step inquiry that is currently employed by courts, the Court finds Nikkal instructive here. In contrast to Nikkal, here, there was no agreement to retain or compensate Dr. Ford for the pre-retention interview he had with Mr. Greenstein. More importantly, the communications alleged by Mr. Greenstein were nowhere near as detailed, intense, or probing into the merits of the case as the meeting between the Nikkal plaintiff's counsel and the expert — a

12

meeting that the <u>Nikkal</u> court found insufficient to warrant disqualification. Indeed, Mr. Greenstein has offered only unspecific and vague characterizations of the allegedly confidential material discussed with Dr. Ford and a conclusory statement of his belief that his communications with Dr. Ford were bound by a confidential relationship. Without more, the Court has an insufficient evidentiary basis to conclude that Mr. Greenstein had an objectively reasonable belief that he had a confidential relationship with Dr. Ford and that the matters discussed were privileged.

### 3. POLICY CONSIDERATIONS

Finally, the Court notes that the interests of justice would not be served by granting the defendant's eleventh-hour motion to disqualify Dr. Ford. The discovery cut-off has passed, the parties have filed five motions for partial summary judgment, and the January 22, 2002 trial date is rapidly approaching. By its own admission, the defendant learned of Dr. Ford's retention by the plaintiffs on March 31, 2001 — six months before the defendant filed the instant motion — when the plaintiffs served the defendant with a copy of Dr. Ford's consumer survey regarding the famousness of the NISSAN mark. (Def.'s Mot. at 1:12-16.)

"The policy objectives that weigh against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." <u>United States ex rel., Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.</u>, 994 F. Supp. 244, 251 (D.N.J. 1997) (citing <u>Cordy v. Sherwin-Williams Co.</u>, 156 F.R.D. 575, 580 (D.N.J.

1994)). "In balancing these concerns, courts have considered whether another expert is available and whether the opposing party will be unduly burdened by having to retain a new expert." Id. at 251-52 (citing Koch Refining, 85 F.3d at 1183; Wyatt, 871 F. Supp. at 422 (M.D. Ala. 1994); Cordy, 156 F.R.D. at 582); see also Topps, 2001 WL 406193, at *2-*3 (finding that a "dearth" of qualified experts "strongly weigh[s] against" disqualification). As evidenced by the summary of Dr. Ford's professional experience contained in paragraphs 16 through 25 of the plaintiffs' Rule 26 Expert Disclosure Report, Dr. Ford appears to be a well-qualified expert. (Beck Decl. Ex. A at ¶¶ 16-25.) If the Court were to grant the instant motion, the defendant's inexcusable delay in bringing the instant motion would likely prejudice the plaintiffs' opportunity to hire a comparable expert to replace Dr. Ford before trial.[6] This is precisely the type of undue burden against which numerous courts have cautioned. See Cherry Hill, 994 F. Supp. at 251-52 (collecting cases).

---

[6] The Court notes that the factual assertions contained in the defendant's papers, however construed, do not indicate any reason why the defendant could not have brought the instant motion five or six months ago.

14

### III. CONCLUSION

For the foregoing reasons, the Court denies the defendant's motion to disqualify Dr. Ford.

IT IS SO ORDERED.

Dated: 11-7-01

DEAN D. PREGERSON
United States District Judge