```
             FILED
   CLERK, U.S. DISTRICT COURT

        SEP 2 1 2007

 CENTRAL DISTRICT OF CALIFORNIA
 BY                      DEPUTY
```

✓ **Priority**
✓ **Send**
✓ **Clsd**
✓ **Enter**
NO **JS-5/JS-6**
  **JS-2/JS-3**
  **Scan Only**



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NISSAN MOTOR CO., LTD., a    )   Case No. CV 99-12980 DDP (Mcx)
Japanese corporation; NISSAN )
NORTH AMERICA, INC., a       )   **FINDINGS OF FACT AND CONCLUSIONS**
California corporation,      )   **OF LAW**
                             )
                Plaintiff,   )
                             )
        v.                   )
                             )
NISSAN COMPUTER CORPORATION, )
a North Carolina             )
corporation; THE INTERNET    )
CENTER, INC.,                )
                             )
                Defendants.  )
_____)

From March 27, 2007 to March 30, 2007, a trial was held before

this Court for purposes of determining whether Nissan Computer's

use of the NISSAN mark is a diluting use under the Trademark

Dilution Revision Act of 2006, 15 U.S.C. § 1125, and what the scope

of relief should be on Nissan Motor's trademark

///

///

///



1  infringement claim.[1]  Following the trial, the Court makes these

2  findings of facts and conclusions of law.

3

4                          **FINDINGS OF FACT**

5  I.   **The Parties**

6       1.    Plaintiff Nissan Motor Co., Ltd. ("Nissan Motor") is a

7             Japanese corporation with its principal place of business

8             in Tokyo, Japan.  It manufactures, sells, and distributes

9             automobiles and automobile-related parts and services in

10            connection with the NISSAN trademark.

11      2.    Plaintiff Nissan North America, Inc. ("NNA"), a

12            California corporation with its principal place of

13            business in Nashville, Tennessee, is a wholly owned

14            subsidiary of Nissan Motor.  NNA distributes NISSAN

15            vehicles and related parts and services and uses Nissan

16            Motor's NISSAN mark in the United States pursuant to a

17            license.[2]

18      3.    Defendant Nissan Computer Corporation ("Nissan Computer")

19            is a North Carolina corporation with its principal place

20            of business in Raleigh, North Carolina.  Nissan Computer

21            is engaged in the business of selling and servicing

22            computers, computer hardware, software, and peripherals.

23            It also offers computer networking services and supplies,

24  _____

25      [1]  Although the parties initially intended to address the
     scope of relief on the infringement claim at a hearing post-trial,

26   the Court entertained arguments on that issue on the final day of
     trial.  Thus, the Court has addressed it here.

27      [2]  Throughout this Order, the Court has attempted to refer to
     NNA and Nissan Motor separately.  However, the Court has, at times,

28   referred to the parties jointly as "Nissan Motor."

                                    2

and offers Web-hosting services and e-mail services as an Internet Services Provider ("ISP").  Nissan Computer is wholly owned by Uzi Nissan, its president.

4.  Defendant The Internet Center is a North Carolina corporation with its principal place of business in Raleigh, North Carolina.  The Internet Center formerly offered ISP and computer training services, but no longer engages in business.  The Court has previously found that The Internet Center is an alter ego of Nissan Computer with respect to the claims for trademark infringement and dilution in this matter.  Uzi Nissan owns a majority of the shares of The Internet Center.

## II.  History of the Use of NISSAN Mark by Nissan Motor in the United States

5.  In the late 1950s, Nissan Motor decided to sell its automobiles in the United States under the DATSUN trademark.

6.  By October 1958, Nissan Motor started advertising DATSUN automobiles in the United States.  Such advertising sometimes featured the NISSAN trademark.

7.  Nissan Motor registered the NISSAN trademark on the principal register of the United States Patent and Trademark Office on October 13, 1959 in connection with automobiles and motor trucks.  (Reg. No. 686,587.)  This registration is now valid and incontestible.

8.  Nissan Motor began selling its automobiles in the United States in earnest by 1961.  The majority of the Nissan Motor automobiles sold in the United States in the 1960s

3

1    and 1970s were sold with the DATSUN trademark and the

2    NISSAN trade name.

3    9.   By 1981, Nissan Motor decided that it would phase out its

4    use of the DATSUN trademark and use only the NISSAN mark

5    everywhere its automobiles were sold.  This decision was

6    motivated by a desire to develop a universal brand image

7    for Nissan Motor around the globe.

8    10.  Starting in 1983, Nissan Motor's vehicles bore brand

9    badges with both DATSUN and NISSAN.  Starting in 1985,

10   Nissan Motor vehicles were sold in the United States

11   exclusively under the NISSAN mark.

12   11.  Starting in 1981, NNA also began to change its marketing

13   to highlight the NISSAN trademark more prominently.

14   Between 1981 and 1985, NNA marketing typically referred

15   to both the NISSAN and DATSUN trademark in some respect.

16   12.  In 1985, NNA began transitioning its dealer network to

17   the NISSAN name, requiring each of those dealers to

18   replace all of their DATSUN signs with NISSAN signs by

19   the beginning of 1987.  NNA installed nearly 6,000 new

20   NISSAN signs at 1,100 different dealers around the

21   country between 1985 and the beginning of 1987.

22   13.  NNA required each of the authorized dealers to sign

23   agreements confirming that they would remove all DATSUN

24   signs and only display NISSAN signs from that point

25   forward.

26   **III. Advertising of NISSAN Trademark by NNA between 1981 and 1991**

27   14.  Between 1981 and 1991, NNA actively marketed the NISSAN

28   trademark by promoting that mark to U.S. consumers

4

1        through various media, including television, radio,
2        magazines, newspaper, and direct mail.

3  15.   This advertising included a marketing campaign
4        specifically directed at expanding awareness of the
5        NISSAN trademark called "THE NAME IS NISSAN."  Such
6        advertising ran extensively between the end of 1985 and
7        1988.

8  16.   NNA's television advertising was shown on national
9        broadcast and cable television, including during popular
10       prime time television programs such as "Hill Street
11       Blues" and "L.A. Law," and during popular sporting events
12       like the 1990 Super Bowl.

13  17.  NNA's "Road to Rio" campaign promoting the NISSAN
14       PATHFINDER and its "Bob's Road" campaign promoting the
15       NISSAN SENTRA received awards as the best television
16       commercials in 1987 and 1990, respectively.

17  18.  NNA advertised in newspapers and magazines with high
18       circulation and national distribution, including
19       Newsweek, Sports Illustrated, Rolling Stone, Fortune, USA
20       Today and The Wall Street Journal.

21  19.  NNA sent direct mail marketing to United States consumers
22       including brochures prominently featuring the NISSAN
23       trademark and detailing the product features of NISSAN-
24       branded automobiles.

25  20.  NNA advertised through various sporting events, including
26       the Professional Golf Association, Major League Baseball,
27       and numerous automobile and truck racing events around

28

1   the country.   Notably, NNA has been the name sponsor of

2   the "Nissan Los Angeles Open" for over two decades.

3   21.   NNA has also advertised at auto shows every year in

4   various cities in the United States, including New York,

5   Detroit, Chicago and Los Angeles.   These auto shows were

6   routinely previewed by local media and were visited by

7   hundreds of thousands of consumers.

8   22.   Between 1985 and 1991, Nissan Motor spent approximately

9   $900 million in marketing the NISSAN trademark.   This

10   figure includes the following annual expenditures on

11   national marketing of the NISSAN mark:

12   1985 $131,688,000

13   1986 $125,784,000

14   1987 $92,819,000

15   1988 $147,588,000

16   1989 $144,828,000

17   1990 $128,040,000

18   1991 $127,982,000

19   These amounts do not include NNA expenditures on regional

20   marketing or dollars spent by authorized NISSAN dealers

21   to promote the NISSAN mark and products sold in

22   connection with that mark.

23   23.   Between 1987 and 1991, many of the highest regarded

24   publications in the automotive industry gave NISSAN

25   vehicles awards for their quality.

26   24.   A recent article in Automobile magazine declared that the

27   1991 NISSAN 300ZX Turbo was one of the top 20 cars

28   released in the United States in the last 20 years.

6

25. From 1985 to 1991, Nissan Motor sold almost 5 million
    vehicles that prominently displayed the NISSAN mark. The
    annual sales for these vehicles were as follows:

        1985   830,767

        1986   770,302

        1987   745,668

        1988   642,461

        1989   661,693

        1990   597,643

        1991   547,984

    These sales were made through NNA's network of 1,100
    authorized dealers, which were strategically located
    throughout the United States.

26. While these sales were declining in 1990 and 1991, such
    decline was consistent with the overall experience of the
    automotive industry due to the economic climate of the
    time.

27. As of May 1991, millions of United States consumers were
    driving new and used NISSAN vehicles on the streets and
    highways of this country.

## IV. The History of the Use of the Word "Nissan" by Nissan Computer

28. Uzi Nissan came to the United States in 1976. In 1980,
    Mr. Nissan established a business known as Nissan Foreign
    Car Repair Service.

29. In 1984, while still engaging in the car repair business,
    Mr. Nissan began laying the groundwork for an
    import/export business. In 1987, he named that business
    Nissan International.

7

30.  In 1991, Mr. Nissan started Nissan Computer and licensed it to use his name.  Nissan Computer primarily sells goods in North Carolina.

31.  In May 1994, Nissan Computer registered the domain name nissan.com.  Shortly thereafter, Nissan Computer established a website at that address.

32.  In 1996, Nissan Computer registered the domain name nissan.net and began to use a website at that address to offer services as an ISP.[3]

## V.  The Use of the Word "Nissan" in Commerce in the United States

33.  "Nissan" is a common Jewish surname.  It is also a common word in both Hebrew and Arabic, and a Biblical term originally identifying the first month in the Jewish calendar.  It is also the contemporary name of the seventh month in the Jewish calendar, and the Arabic word for April.

34.  Moreover, to a Japanese speaker, "Nissan" is an easily-recognized abbreviation of the generic words "Japanese Industrial Companies, Ltd."

35.  The name "Nissan" is also used worldwide, including in the United States, by five other Japanese corporations pursuant to what the parties have called the "six party agreement."  The six party agreement is not a licensing agreement, but rather a "co-existence" agreement allowing each of the parties to use the "Nissan" name.  Among the signatories to the six party agreement is Nissan Fire and

---

[3]  The Court notes that this litigation primarily focused on Nissan Computer's conduct regarding nissan.com, not nissan.net.

Casualty Insurance Co., a large casualty insurer.
Another signatory is Nippon Oxygen Company, which is now
a subsidiary of Thermos Nissan but still uses the name
"Nissan" in trade.  Another signatory is Nissan Chemical,
a large chemical product producer.

36. There are several other corporations, small businesses
and sole proprietorships selling goods within the United
States who use the "Nissan" name, including but not
limited to Nissan Antique Trading Corp., Nissan
Woodworks, Nissan Fire/Nissan Management, Nissan
Jewelers, Nissan Realty, Clayton Nissan Insurance, Nissan
Jewelry, Nissan Fabric & Textile, Nissan Rice, and Nissan
Services Enterprises.

37. There are also many websites that use the word "Nissan"
in their domain names.

## VI. Advertising on Nissan Computer's Websites

38. In August 1999, Nissan Computer signed up with an
internet advertising site known as Befree.com.
Befree.com offered website operators an opportunity to
post advertisements for third parties on their websites.
Any website operator who posted advertisements for one of
Befree's customers would receive a small payment for each
"click through" to that customer's website.

39. In late September 1999, Nissan Computer began posting
advertisements for automobile-related websites at
Befree.com.  Over the course of the next two months,
Nissan Computer signed up a few automobile-related
websites.  These websites typically provided automobile-

related information and offered to put consumers in contact with an automobile dealer.  None offered automobiles for sale.

40.  The advertisements for automobile-related websites never constituted more than 5 of the total 23 advertisers whose advertisements appeared on nissan.com.  There were never more than 3 active automobile-related banner advertisers on the site.

41.  During the fall of 1999, Nissan Computer's then Network Administrator, Victor Fayed, changed the appearance of the Nissan Computer websites to minimize the use of the Computer Corporation terms and to emphasize the NISSAN term.  He also changed the logo on the website by placing it in an oval background.  After the change, it more closely resembled the one used by Nissan Motor.[4]

42.  The websites also displayed a statement: "Not affiliated with Nissan Motor Company, Ltd."

43.  Nissan Computer removed its auto-related advertisements from its websites one business day – December 13, 1999, after Plaintiffs filed suit.

44.  Nissan Computer later included at nissan.com a link to ncchelp.org, a website dedicated to discussing Nissan Computer's views of this case.  Ncchelp.org, in turn, contained a link to hotlinks-usa.com, which, in turn,

---

[4]  The Nissan Motor logo is a circle with a horizontal bar, with the word "Nissan" spelled out in the horizontal bar.  As noted below, the Nissan Computer logo displayed at nissan.com is no longer superimposed on an oval background.

10

1   contained auto-related advertising.  This link was

2   removed in 2001.

3   **VII.  Mr. Nissan's Meetings With Merrill Davis of NNA**

4   45.   Nissan Motor was aware that Nissan Computer was operating

5        a website at nissan.com at least as early as July 1995.

6        In that month, a Nissan Motor trademark attorney wrote to

7        Nissan Computer to express "concern" about Nissan

8        Computer's operation of a website at nissan.com.

9        However, Nissan Motor took no action for over four years

10       thereafter, even though Mr. Nissan did not respond to

11       Nissan Motor's letter and continued to operate the

12       website.

13   46.   On October 14, 1999, Merrill Davis, the Corporate Manager

14       of NNA's eBusiness strategy, contacted Uzi Nissan to

15       discuss the potential sale of the domain names associated

16       with the Nissan Computer websites.  At a meeting that day

17       in Raleigh, North Carolina, Mr. Nissan showed Mr. Davis

18       the website, including the banner advertisements that

19       were then posted.  Mr. Nissan also told Mr. Davis that

20       one-third of the e-mails he received inquiring about

21       products were intended for Nissan Motor.

22   47.   Mr. Davis indicated that Nissan Motor was interested in

23       buying the nissan.com domain name.  Mr. Nissan indicated

24       that he was not interested in selling.  He suggested that

25       Nissan Computer might be interested in an arrangement

26       whereby Nissan Motor would place a permanent link on

27       nissan.com, directing consumers to the Nissan Motor

28

websites, in return for which Nissan Computer would receive payments for each "click through."

48. Mr. Davis and Mr. Nissan met again on October 15, 1999 to continue their discussion. Mr. Nissan made other proposals about the ways in which Nissan Computer and Nissan Motor could effectively share the nissan.com site. At the end of the meeting, Mr. Davis indicated that he needed to discuss the various offers and counteroffers with his supervisors and departed Raleigh. At no time during these conversations did Mr. Davis threaten any legal action against Nissan Computer.

49. In early December, Mr. Davis requested a second meeting with Mr. Nissan. At that meeting, on Friday, December 10, 1999, Mr. Davis indicated that Nissan Motor was not interested in any arrangement beyond an outright sale of the domain name.

50. Mr. Nissan repeated that he was not interested in selling the domain name. When Mr. Davis persisted, Mr. Nissan said "OK, my price is $15 million, do you understand now that I don't want to sell?"

51. Plaintiffs filed their complaint against Nissan Computer that same day.

## VII. Internet Traffic

52. The volume of visitors who were accessing the Nissan Computer websites grew substantially in the late 1990s as the internet grew in popularity.[5]

---

[5] The parties disagree about the number of "unique" visitors
(continued...)

1    53.   A large number of consumers still visit the nissan.com

2          website.  For example, web traffic metrics show that

3          approximately 500,000 unique visitors visit the Nissan

4          Computer websites on a monthly basis.

5    54.   Over 80% of all people shopping for NISSAN cars and

6          trucks now use the Internet in some part of their product

7          search or their buying process.

8  IX.   **The Parties' Current Websites**

9    55.   NNA has developed a website at nissanusa.com.  This

10         website promotes Nissan Motor, its brand and its

11         products.  It does not display any third-party

12         advertising.

13   56.   Nissanusa.com is a sophisticated website which features

14         flash animation and extensive interactive features.  It

15         is governed by strict visual identity guidelines and

16         specific quality standards.  It is the first website

17         listed when "Nissan" is entered in a search engine.

18

19

---

20      [5]   (...continued)

21  that actually viewed the Nissan Computer websites during this time.
    (See Defs.' Br. Regarding Admissibility of So-Called Access Logs,

22  filed June 19, 2007; Nissan Motor's Response, filed June 29, 2007).
    For example, at trial, Nissan Motor introduced Exhibit 127,

23  consisting of an "access log" generated by Victor Fayed, as proof
    of the internet traffic at nissan.com in January 2000.  The access

24  log gives "monthly statistics" in a variety of different metrics,
    including "total hits," "total files," "total visits," and "total

25  unique user agents."  The meaning of those terms is undefined in
    the access log itself, and the Court is not convinced that any of

26  these terms is a reliable indicator of the number of visitors to
    nissan.com in the relevant time.  Accordingly, the Court does not

27  rely on Exhibit 127 as proof of actual internet traffic on
    nissan.com in January 2000.  The Court does, however, believe it

28  safe to assume that thousands of individuals visited the Nissan
    Computer websites in the late 1990s.

13

57. <u>Nissan.com</u> is not a technologically-advanced website.  It features text-based advertising for Nissan Computer products.

58. <u>Nissan.com</u> also displays third-party advertising for non-computer-related products.  However, only one third-party advertiser can currently be accessed through the site.  The remaining third party advertising links are dead.

59. <u>Nissan.com</u> displays the Nissan Computer logo in two places, at the left and right top corners of the website.  This logo consists of the word "Nissan" on a horizontal axis, and the word "Computer" on a horizontal axis.  "Nissan" is written in a larger font than "Computer."

X.  **Expert Opinions and Surveys**[6]

60. Nissan Motor offered the expert opinion of Gerald Ford, Ph.D., to identify consumer associations with the name "Nissan."   Dr. Ford testified regarding a survey he conducted in 2001.  Dr. Ford asked 407 survey respondents to identify whether they associated any company, person, or thing with the word NISSAN and, if so, asked them to identify all such companies, persons, or things.

61. Based on the results of the survey, Dr. Ford concluded that as of 2001, over 75% of the general consuming public

---

[6]   During trial, the Court was presented with evidence of trademark registrations and common law trademark use from a search report conducted by Thomson & Thomson for Nissan Computer's counsel in 2001.  This report was admitted as Exhibit 179 subject to a later ruling.  After reviewing the report and the case law, the Court finds that the report is not probative of actual third party use of the mark.  Because Exhibit 179 is irrelevant to the dilution inquiry, the Court sustains Nissan Motor's objection to it and hereby strikes it from the record.

associated the word "Nissan" exclusively with Nissan
Motor and over 83% of the consuming public who use the
Internet exclusively associated the word "Nissan" with
Nissan Motor.

62. A small number of survey respondents associated another
company, person or thing with the name "Nissan." For
example, two respondents identified a company producing
thermos or coffee mugs, two of them identified food
products, and one indicated that "Nissan" was the middle
name of his wife.

63. Nissan Computer offered several criticisms of Dr. Ford's
methodologies.[7] Dr. Ford responded to those criticisms
at trial. For example, he explained how the mention of
the term "cars" in the interviewer instructions did not
bias the interviewers or impact the results of his survey
in any way. Dr. Ford verified this conclusion by looking
at the results of his survey both before and after this
interviewer instruction was added. Because they did not
differ in any material way – other than to result in a
lower level of association – he concluded that this
changed instruction did not alter his conclusions

64. Nissan Computer also criticized the way the survey
results were "coded." However, the Court heard nothing
to suggest the survey results were improperly recorded.

65. Finally, Nissan Computer argued that the survey was
biased because it did not use a control group. However,

---

[7]  Nissan Computer offered the expert testimony of Mr. Kenneth
Hollander in its attempt to discredit the Ford and Jay surveys.

1   Nissan Computer's experts did not credibly explain how

2   using a "control group" would have affected the survey's

3   accuracy.

4   66.  Thus, after hearing Dr. Ford's testimony and Nissan

5        Computer's criticisms of it, the Court finds the study

6        reliable and accepts its conclusions.

7   67.  Nissan Motor also offered the testimony of expert Evelyn

8        Deborah Jay, Ph.D., who testified regarding a consumer

9        survey that she conducted during the last week of 1999

10       and the first week of 2000 to address consumer

11       expectations with respect to what consumers thought they

12       would find at the nissan.com and nissan.net websites.

13  68.  Dr. Jay surveyed 367 individuals who had used the

14       Internet or intended to use the Internet in the future to

15       access information.  She asked these individuals what

16       they thought they would find at nissan.com and

17       nissan.net.

18  69.  In response to the series of questions regarding

19       expectations for the content at the nissan.com and

20       nissan.net websites, 92.9% of the individuals surveyed

21       indicated that they expected to find Nissan Motor the car

22       company or information about car products on the

23       websites.

24  70.  In response to a second series of questions regarding

25       what consumers had heard or knew about "Nissan," Dr. Jay

26       concluded that 76.6% had heard something regarding Nissan

27       Motor and/or its products.

28

16

71.   Dr. Jay also testified that, in response to the first
      series of questions regarding what consumers expected to
      find at nissan.com or nissan.net, only seven respondents
      had identified electronics or appliances, two respondents
      had identified computers, five respondents had identified
      an individual, six individuals had identified food
      products, three individuals had identified books and four
      individuals had identified a pornographic site.   In
      response to the second series of questions regarding what
      consumers knew or had heard about "Nissan," less than 1%
      of the respondents stated that they heard of electronics
      or appliances, food products or thermos bottles,
      respectively.   No one mentioned computers, books or
      pornography in response to the second series of
      questions.

72.   Dr. Jay concluded that she believed consumers in early
      2000 primarily associated the term "Nissan" with cars.

73.   Nissan Computer offered criticisms of the Jay survey
      similar to those of the Ford survey.   The Court also
      rejects those criticisms and finds that the survey
      results were credible.

74.   Nissan Motor also offered the expert opinion of Peter
      Sealey, Ph.D., on the importance of building and
      maintaining a strong brand.

75.   Dr. Sealey also testified that the inconsistent nature
      between the parties' respective websites is harmful to
      the NISSAN "brand promise" for Nissan Motor.   The Court
      did not find Dr. Sealey's testimony to be particularly

17

1    helpful.  Other than references, experience and

2    background, Dr. Sealey offered little, if any, empirical

3    or other support for his opinion.  The Court recognizes

4    that surveys, references to publications, and other

5    source material are not necessarily required as the basis

6    of the opinion.  However, here the Court felt that Dr.

7    Sealey's broad assertions of harm lacked sufficient

8    credible foundation.  Moreover, because Nissan Motor did

9    not establish Dr. Sealey as an expert in internet

10   advertising, the Court does not accept his testimony on

11   this issue as probative.

12   76.  Finally, Nissan Motor offered a Landor Research survey,

13        indicating that, as of 1988, the NISSAN mark was one of

14        the 200 most powerful brands in the country.  Nissan

15        Motor also offered a study conducted by Allison Fisher

16        indicating that, between December 1987 and June 1991, at

17        least 60% of American consumers were aware of NISSAN-

18        brand automobiles.  The Court accepts the findings of

19        these surveys.[8]

20   77.  Nissan Computer also offered the opinions of several

21        experts.  Nissan Computer called Ronald Buckhammer as an

22   _____

23        [8]  Nissan Computer argues that the Allison Fisher survey only
     measured the attitude of people who intended to buy a new car,
24   thereby skewing the results of Nissan Motor.  Nissan Computer also
     criticizes the reliability of the Landor Research survey.  The
25   Court generally found these criticisms to lack merit; both studies
     are well-known, reputable and generally considered to be reliable.
26   However, the Court has taken Nissan Computer's criticisms into
     account in determining the evidentiary weight given to these
27   surveys.  See E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d
     1280, 1292 (9th Cir. 1992) (noting that it is routine to admit
28   relevant surveys in trademark cases; "any technical unreliability
     goes to weight, not admissibility.").

18

1     expert in the automotive marketing industry.  Mr.
2     Buckhammer testified that consumers who seek automotive
3     information on the internet are typically a little more
4     sophisticated internet users than other consumers.  He
5     also noted that the Nissan Motor's target audience: (1)
6     is under 40; (2) is composed of college graduates; (3)
7     has annual incomes that exceed $35,000 if single; $50,000
8     if married.

9  78. Mr. Buckhammer also opined that Nissan Motor was "tardy"
10     in implementing an internet marketing strategy – even
11     when compared to the rest of the automotive industry,
12     which was also "late" to internet marketing relative to
13     other consumer markets.

14  79. The Court credits Mr. Buckhammer's testimony on these
15     issues.

16  80. Nissan Computer also offered the expert testimony of
17     Barbara Luna, Ph.D.  Dr. Luna analyzes financial,
18     accounting, economic, business and intellectual property
19     issues relating to liability and damages in litigation
20     matters.

21  81. Dr. Luna testified that she had reviewed the internet
22     traffic on nissan.com and had conducted a statistical
23     analysis to determine whether Nissan Motor lost any sales
24     as a result of Nissan Computer's possession of
25     nissan.com.  She determined that it had not.  The Court
26     found this determination to be credible and consistent
27     with common internet usage.  The internet is no longer an
28     emerging technology.  Its use has become routine for

19

1        anyone with access to a computer.  Most consumers, even

2        those with only minimal experience using the internet,

3        can locate their desired websites even when their

4        searches initially lead them to incorrect sites.

5        Moreover, when an initial site is quite obviously

6        unrelated to the desired site, most consumers will

7        quickly leave that site and continue their searches until

8        they find their desired site.  Accordingly, those looking

9        for information on Nissan cars who began their searches

10       at nissan.com likely arrived at nissanusa.com certainly

11       within minutes, if not within seconds.

12  82.  Dr. Luna also represented that approximately 93% of

13       people searching for automobile information on the

14       internet now use search engines during their search.  In

15       this age of Google and Yahoo!, the Court finds this

16       representation to be credible.

17  83.  Dr. Luna also testified that her survey results indicated

18       only 6.5% of individuals who begin their "Nissan"

19       internet searches using a search engine and eventually

20       access nissan.com are looking for information on cars at

21       nissan.com.  The Court accepts this statistical estimate

22       as logical.  As noted above, Nissan Motor owns

23       nissanusa.com, the first link that appears when users

24       type "Nissan" into a search engine.  It is common

25       knowledge that large companies pay to have their websites

26       prominently displayed on search engine result lists, and

27       the Court expects that most internet users are aware of

28       this practice.  Accordingly, it is reasonable to assume

1    that the majority of consumers looking for information on

2    Nissan Motor's products through a search engine find the

3    nissanusa.com site almost immediately and have no need to

4    access the nissan.com link.

5    84.   Finally, to the extent that Dr. Luna offered other

6          opinions, the Court did not find them particularly

7          helpful or supported by sufficient foundation.

## XI.   Past Proceedings

9    85.   This Court previously determined that Nissan Computer is

10         not liable for cybersquatting under 15 U.S.C. § 1125(d).

11         The Court has also determined that Nissan Computer is not

12         liable for trademark infringement for any activities

13         conducted at its website that did not involve

14         automobile-related advertising.

15   86.   The Court issued a preliminary injunction enjoining

16         Nissan Computer from displaying automotive-related

17         advertising on its website.  That injunction was affirmed

18         by the Ninth Circuit.  See Nissan Motor Co., Ltd. v.

19         Nissan Computer Corp., 89 F.Supp.2d 1154 (C.D. Cal.),

20         aff'd, 246 F.3d 675 (9th Cir. 2002).[9]

---

[9]   That injunction stated:

IT IS HEREBY ORDERED that the defendant shall immediately,
and for the pendency of this action:

(1)   post a prominent caption, in the upper portion
      of the first web page of the nissan.com and
      nissan.net websites, identifying these websites
      as affiliated with Nissan Computer Corporation;

(2)   post a prominent disclaimer, in the upper
      portion of the first web page of the nissan.com
      and nissan.net websites, informing visitors that

                                        (continued...)

87.  The Court subsequently entered summary judgment finding such conduct to be trademark infringement, and that ruling was also affirmed by the Ninth Circuit.  Id.

88.  The Court previously entered summary judgment finding that Nissan Computer and The Internet Center had diluted the NISSAN mark.  The Ninth Circuit reversed that decision and remanded the case so that the Court could determine whether: (1) the NISSAN mark was famous at the critical date of fame; and (2) Nissan Computer's use of the NISSAN mark actually diluted the NISSAN mark consistent with the Supreme Court's holding in Moseley v. V. Secret Catalogue, 537 U.S. 418 (2003).

89.  On remand, the Court determined that the critical date for measuring fame in this case was May 14, 1991.

---

9   (...continued)
   the nissan.com and nissan.net websites are not affiliated with the plaintiffs and identifying the location of Nissan North America's website; and

   (3)  refrain  from  displaying automobile-related information, advertisements, promotions, or Internet links on the nissan.com and nissan.net websites, except as set forth above.

IT IS FURTHER ORDERED that this Order is granted on the condition that the plaintiffs file a bond in the sum of $100,000 within five business days of the entry of this Order to make good such damages, not to exceed said sum, as may be suffered or sustained by defendant if it is subsequently found to be wrongfully restrained hereby.

Nissan Motor Co., Ltd. v. Nissan Computer Corp., 89 F.Supp.2d 1154, 1165-66 (C.D. Cal. 2000).  The preliminary injunction was only in effect for approximately one year.

22

90. In October 2006, Congress abrogated <u>Moseley</u> with the passage of the Trademark Dilution Revision Act of 2006 (the "TDRA"), 15 U.S.C. § 1125(c).[10]

91. Nissan Motor has waived its infringement and dilution claims made under California law.

92. Thus, the Court must now decide these remaining issues: (1) whether Nissan Computer's use of the NISSAN mark violates the Trademark Dilution Revision Act ("TDRA"), and, if so, what remedies are appropriate;[11] and (2) whether Nissan Computer should be permanently enjoined from engaging in the conduct for which it was found liable as a trademark infringer.[12]

## CONCLUSIONS OF LAW

The TDRA provides:

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time

---

[10] Although some courts have noted that the TDRA changed the law to the <u>pre-Moseley</u> standard, <u>see, e.g.</u>, <u>Levi Strauss & Co. v. Fox Hollow Apparel Group, LLC</u>, 2007 WL 1140648 (N.D. Cal. Apr. 17, 2007), the Court believes that by listing six non-exclusive factors for courts to consider when determining whether dilution by blurring has occurred, the TDRA sets a different standard.

[11] With respect to its dilution claim, Nissan Motor seeks an injunction barring any further commercial use by Nissan Computer of the <u>nissan.com</u> and <u>nissan.net</u> sites.

[12] Nissan Motor also indicated that, pursuant to the rules of the Court, it would move for attorneys' fees on its trademark infringement claim during post-trial proceedings following the entry of judgment.

1          after the owner's mark has become famous, commences

2          use of a mark or trade name in commerce that is likely

3          to cause dilution by blurring or dilution by

4          tarnishment of the famous mark, regardless of the

5          presence or absence of actual or likely confusion, of

6          competition, or of actual economic injury.

7          15 U.S.C. § 1125(c)(1).

8     To prove a claim of dilution, the Ninth Circuit requires that

9  the plaintiffs must show: "(1) the mark is famous; (2) the defendant

10 is making a commercial use of the mark in commerce; (3) the

11 defendant's use began after the mark became famous; and (4) the

12 defendant's use of the mark dilutes the quality of the mark by

13 diminishing the capacity of the mark to identify and distinguish

14 goods and services." <u>Panavision Intern., L.P. v. Toeppen</u>, 141 F.3d

15 1316, 1324 (9th Cir. 1998).[13]

16    From its analysis of the foregoing facts, the Court concludes:

17 **I.   The NISSAN Mark Was Famous as of May 1991 - Before Nissan**

18 **Computer Began Its Commercial Use of the Mark[14]**

19 ───────────────────────────────

20    [13]  The parties do not dispute that Nissan Computer is making
   a commercial use of the mark, or that its use began after May 1991.
21 Thus, because the Court has determined that the mark was famous by
   May 1991, it finds that the second and third <u>Panavision</u> elements
22 are satisfied and need not be discussed in detail.

23    [14]  As the Ninth Circuit held on appeal, "for purposes of the
   FTDA . . . the commercial use of "Nissan" for computers in Nissan
24 Computer was a use of the NISSAN mark in commerce that was arguably
   diluting." <u>Nissan Motor Co. v. Nissan Computer Corp.</u>, 378 F.3d
25 1002, 1013 (9th Cir. 2004), <u>cert. denied</u>, 125 S.Ct. 1825 (2005).
   Thus, while the focus of this litigation is on Nissan Computer's
26 commercial use of the NISSAN mark through its websites, the Court
   notes that this is not the only potentially dilutive use. <u>See id.</u>
27 at 1012 (noting in the pre-TDRA context: "It follows that NISSAN
   Computers is a use that arguably dilutes the NISSAN mark.  <u>Whether</u>
28 <u>it does in fact, of course, depends upon whether the capacity of</u>
                                                    (continued...)

1.   Under the TDRA, the Court may consider the following non-exhaustive list of factors in determining the fame of the mark: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; (4) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.  15 U.S.C. § 1125(c).

A.   **The Duration, Extent, and Geographic Reach of Advertising and Publicity of the Mark Weigh in Nissan Motor's Favor**

2.   As detailed above, Nissan Motor and NNA had been using the NISSAN mark in marketing materials and on vehicles for over three decades as of 1991.  By 1981, Nissan Motor started marking its vehicles with the NISSAN mark and NNA featured the NISSAN trademark prominently in all of its advertising.

3.   Starting in 1985, all Nissan Motor vehicles displayed the NISSAN trademark.

4.   By 1987, every NNA dealer had replaced its DATSUN signs with NISSAN signs.

5.   Between 1985 and 1991, NNA spent approximately $900 million advertising the NISSAN mark, an amount that does

---

[14]   (...continued)
the NISSAN mark to identify and distinguish goods or services sold by Nissan Motor has been lessened.") (emphasis added).

1        not take into account its regional marketing or its 1,100

2        dealers' marketing.

3    6.    The media extensively covered NISSAN products during the

4        relevant time period.

5    7.    In sum, the NISSAN mark had been widely advertised and

6        publicized for at least a decade by May of 1991, and such

7        advertising and publicity reached consumers throughout

8        the United States during that time period.

9    8.    Accordingly, the Court finds that Nissan Motor sustained

10       its burden of proof of showing that NISSAN was a

11       "household name" as of 1991.  See, e.g., Thane Int'l v.

12       Trek Bicycle Corp., 305 F.3d 894, 911 (9th Cir. 2002)

13       (citation omitted).

14    9.    Thus, the Court concludes that this factor weighs in

15       Nissan Motor's favor.

16 **B.    The Amount, Volume, and Geographic Extent of Sales of Goods or**

17 **Services Offered Under the Mark Were Substantial**

18    10.   As detailed above, Nissan Motor and NNA sold

19       approximately five million vehicles between 1985 and 1991

20       through its network of 1,100 strategically placed dealers

21       around the country.

22    11.   These sales generated over $59 billion in revenue.

23    12.   Unlike most other consumer goods, purchased NISSAN

24       vehicles were seen on the roads by millions, serving as

25       "moving billboards" for the company.  Because automobiles

26       are a product that consumers tend to use for several

27       years, many of those sold in the early 1980s were likely

28       still on the road in 1991.

13. For these reasons, the Court finds that this factor weighs in favor of Nissan Motor.

**C.   The NISSAN Mark was Recognizable in 1991**

14. As of May 1991, there was widespread use and media coverage of the NISSAN mark.

15. Such consumer recognition was confirmed in part by contemporaneous survey evidence conducted by Landor Research and Allison Fisher.

16. Nissan Computer attempts to counter this evidence by arguing that Nissan Motor needed to improve its "corporate image" during the relevant time period. Therefore, Nissan Computer concludes, the NISSAN mark was not doing as well as Nissan Motor contends.

17. However, the Court does not find this argument persuasive. A company could have a poor or ill-defined corporate image and still have a very famous mark. Whether Nissan Motor had a "good" image in 1991 does not have any bearing on the degree of recognition of its mark.

18. Thus, this factor weighs in Nissan Motor's favor.

**D.   Nissan Motor Registered the NISSAN Mark in 1959**

19. Nissan Motor registered the NISSAN mark with the United States Patent and Trademark Office in 1959. That registration is valid and incontestible today. Thus, the fourth fame factor also weighs in favor of Nissan Motor.

**E.   Balancing the Fame Factors**

20. All four fame factors weigh in Nissan Motor's favor.

21. Other courts (applying the older version of the Trademark
    Dilution Act) have found automobile trademarks like
    NISSAN famous with far less extensive evidentiary
    support.  See, e.g., General Motors Corp. v. Autovation
    Technologies, Inc., 317 F.Supp.2d 756 (E.D. Mich. 2004)
    (GM trademarks are famous); Ford Motor Co. v. Lloyd
    Design Corp., 184 F.Supp.2d 665 (E.D. Mich. 2002) (Ford
    trademarks are famous); Porsche Cars North America, Inc.
    v. Manny's Porshop, Inc., 972 F.Supp. 1128 (N.D. Ill.
    1997) (PORSCHE famous).

22. Courts have also found non-automobile marks to be famous
    based on the same types of evidence submitted by Nissan
    Motor at trial.  See, e.g., Kraft Foods Holdings, Inc. v.
    Helm a/k/a "King Velveeda," 205 F.Supp.2d 942, 947 (N.D.
    Ill. 2002) (finding that annual advertising campaigns and
    sizeable sales contributed to the famousness of the
    VELVEETA mark).

23. The Court also notes that cars are unlike many other
    consumer products or services.  They enjoy an iconic
    status in American culture.  They are tied up with social
    status, and are often personified, or described, as
    having human attributes.  Many Americans use cars as
    their primary means of transportation, and travel in them
    so often that they become, in essence, second homes.
    Because cars are very much part of the everyday
    experience, it is not surprising that a car company that
    has spent millions on product advertising can achieve
    fame for its mark in a relatively short period of time.

24. Therefore, after balancing the fame factors, the Court concludes that the NISSAN mark was unquestionably famous as of Nissan Computer's incorporation on May 14, 1991.[15]

## II. Nissan Computer's Use of the NISSAN Mark Is Not Likely to Cause Dilution of the Mark By Blurring

25. Dilution by blurring is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. See 15 U.S.C. § 1125(c)(2)(B).

26. Dilution by blurring concerns the lessening of the capacity of a famous mark to identify and distinguish goods and services. 4 J. Thomas McCarthy, McCarthy On Trademarks & Unfair Competition, § 24:70 (4th ed. 2006).

27. Because protection from dilution comes close to being a "right in gross," it is a cause of action "reserved for a select class of marks – those marks with such powerful consumer associations that even non-competing uses can impinge on their value." Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999).

28. For dilution to occur, the relevant public must make some connection between the mark and both parties. But that connection is not the kind of mental link between the parties that triggers the classic likelihood of confusion

---

[15]   The Court also concludes that the NISSAN trademark was famous as early as 1987, when: (1) the NISSAN mark had been listed on NISSAN vehicles for several years; (2) the NISSAN mark had been the only mark listed on NISSAN vehicles for at least two years; (3) all Nissan dealers had replaced all of their DATSUN signs with NISSAN signs; and (4) two years of focused "name-recognition" advertising had occurred.

29

1    test.  Rather, the assumption is that the relevant public

2    sees the junior user's use, and intuitively knows,

3    because of the context of the junior user's use, that

4    there is no connection between the owners of the

5    respective marks.  However, even with those who perceived

6    distinct sources and affiliation, the ability of the

7    senior user's mark to serve as a unique identifier of the

8    plaintiff's good or services is weakened because the

9    relevant public now also associates that designation with

10   a new and different source.  Hence, the unique and

11   distinctive link between the plaintiff's mark and its

12   good or service is "blurred."  <u>See</u> 4 J. Thomas McCarthy,

13   <u>McCarthy On Trademarks & Unfair Competition</u>, § 24:70 (4th

14   ed. 2006).

15 29.  Notably, "[i]f the ordinary prospective purchaser, upon

16   encountering the junior user's mark which is the same as

17   the famous mark, is, because of the context, not likely

18   to even think of the famous mark, then dilution by

19   blurring cannot occur."  4 J. Thomas McCarthy, <u>McCarthy</u>

20   <u>On Trademarks & Unfair Competition</u>, § 24:92 (4th ed.

21   2006).

22 30.  Thus, whether Nissan Computer's use of the NISSAN mark on

23   <u>nissan.com</u> is blurring depends upon whether the capacity

24   of the NISSAN mark to identify and distinguish goods or

25   services sold by Nissan Motor is likely to have been

26   lessened.  <u>See, e.g.</u>, <u>Nissan Motor Ltd.</u>, 378 F.3d at

27   1012.

28

30

31. Moreover, the dilution inquiry must be kept distinct from the fame inquiry.  As McCarthy explains:  "Once a court has determined that the plaintiff's mark indeed qualifies as a 'famous' mark, the court should separate any anti-dilution claim into its discrete elements and rigorously require a showing of proof of those elements."  4 J. Thomas McCarthy, <u>McCarthy On Trademarks & Unfair Competition</u>, § 24:67 (4th ed. 2006).

32. Under the TDRA, the Court may consider the following factors in determining whether a defendant's use of a mark is likely to cause dilution by blurring: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the famous mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark.  15 U.S.C. § 1125(c).

33. However, this list of factors is non-exhaustive, and the Court's dilution analysis is "[s]ubject to the principles of equity."  <u>Id.</u>

**A.   Nissan Computer is Using Marks Identical and Similar to the NISSAN Mark**

34. The Ninth Circuit has explained that the addition of ".com" to the end of a famous mark is essentially

31

1   meaningless and does not alter the famous mark in any

2   significant way.  See Brookfield Comm., Inc., v. West

3   Coast Entertainment Corp., 174 F.3d 1036, 1055 (9th Cir.

4   1999).  Thus, the nissan.com and nissan.net marks are

5   identical to the NISSAN mark.

6   35.  In addition, the "Nissan Computer Corp." logo now

7        featured in two places on nissan.com incorporates the

8        word "Nissan" in its entirety.  The word "Nissan" is on

9        the logo's horizontal axis and is larger than the word

10       "Computer," which is featured on the logo's vertical

11       axis.  Thus, the Nissan Computer logo is similar to the

12       NISSAN mark.

13  36.  Accordingly, this factor weighs in Nissan Motor's favor.

14  **B.  The NISSAN Mark Is Not Inherently Distinctive, and Has**

15  **Achieved a Medium-High Degree of Acquired Distinctiveness**

16  37.  The general rule regarding distinctiveness is clear:  An

17       identifying mark is distinctive and capable of being

18       protected if it either (1) is inherently distinctive or

19       (2) has acquired distinctiveness through secondary

20       meaning.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S.

21       763, 769 (1992).

22  38.  Fanciful, arbitrary and suggestive marks are regarded as

23       "inherently distinctive."  Id.  A fanciful mark is a word

24       that is coined for the express purpose of functioning as

25       a trademark.  It could also be any obscure or archaic

26       term not familiar to buyers.  An arbitrary mark consists

27       of a word or symbol that is in common usage in the

28       language, but is arbitrarily applied to the goods or

32

services in question in such a way that it is not descriptive or suggestive.  A suggestive mark requires the purchaser to use its imagination to reach a conclusion as to the nature of the goods.  <u>Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.</u>, 192 F.3d 337, 344 (2d Cir. 1999).

39.  As noted above, "Nissan" is a common Jewish surname.  It is also a common word in both Hebrew and Arabic, and a Biblical term originally identifying the first month in the Jewish calendar.  It is the contemporary name of the seventh month in the Jewish calendar, and the Arabic word for April.  Moreover, to a Japanese speaker, "Nissan" is an easily-recognized abbreviation of the generic words "Japanese Industrial Companies, Ltd."

40.  Accordingly, because the NISSAN mark is not fanciful, arbitrary, or suggestive, it lacks inherent distinctiveness.

41.  A mark that is not inherently distinctive, however, may acquire the distinctiveness which will allow it to be protected under the TDRA.  <u>See id.</u>  This acquired distinctiveness is generally called "secondary meaning." <u>Id.</u>

42.  Nissan Motor argues that the NISSAN mark has achieved a high degree of acquired distinctiveness.  It is true that the NISSAN mark is presumptively distinctive because it has been registered.  <u>See Avery Dennison Corp. v. Sumpton</u>, 189 F.3d 868, 878 (9th Cir. 1999).  It is also true that the NISSAN mark is currently famous.

33

1        Accordingly, as a result of the extensive advertising of

2    the NISSAN mark, the Court finds that the NISSAN mark has

3    achieved a medium-high degree of acquired

4    distinctiveness.

5    43.   Thus, this factor tips in Nissan Motor's favor.

6  **C.   Nissan Motor is Not Engaging in an Exclusive Use of the NISSAN**

7  **Mark**

8    44.   Nissan Motor undoubtedly engages in the most widespread

9          use of the NISSAN mark.  However, there are several other

10         companies, abroad and in the United States, using the

11         NISSAN mark in their company names.  Although some of

12         these companies are essentially "mom-and-pop" shops, some

13         are larger companies with wider customer bases.

14   45.   Moreover, Nissan Motor itself is a party to the "six-

15         party agreement."  This agreement is not a licensing

16         agreement; it is an agreement among five large

17         corporations to share the "Nissan" name.

18   46.   Thus, this factor is neutral:  although Nissan Motor's

19         use is the most widespread, it is not exclusive.

20 **D.   The NISSAN Mark is Widely Recognized Today**

21   47.   There is no dispute that, while the NISSAN mark is not

22         the most famous of marks, it is certainly widely

23         recognized today.  The parties have stipulated to the

24         current fame of the mark.  Accordingly, this factor

25         weighs in Nissan Motor's favor.

26 **E.   There is Conflicting Evidence Regarding Nissan Computer's**

27 **Intent to Create an Association with the NISSAN Mark**

28

48. Nissan Motor makes much of the fact that Nissan Computer registered its domain names after the NISSAN mark had become famous. However, Uzi Nissan had a long history of using his last name in his businesses when he started Nissan Computer.

49. Moreover, when Mr. Nissan registered nissan.com in 1994, the NISSAN mark had only been famous for a relatively short period of time compared to other famous marks. There is no suggestion that, by registering for the nissan.com website, Nissan Computer was trying attract customers through an association with the famous NISSAN mark.

50. It is true that Nissan Computer is not without fault. For a short period in the fall of 1999, Nissan Computer placed auto-related advertising on nissan.com and changed its online logo to one that more closely resembled the NISSAN mark. This brief period of apparent exploitation cuts against Nissan Computer.

51. Nevertheless, after balancing Mr. Nissan's long history of using his last name in business and the absence of any evidence indicating Nissan Computer's intent to associate nissan.com with the NISSAN mark at the time nissan.com was registered, against Nissan Computer's brief period of auto-related advertising in 1999, the Court finds the intent factor neutral.

**F.   There is No Evidence of Any Actual Association Between Nissan Computer and the NISSAN Mark**

52.  The final blurring factor gets to the heart of the
     dilution inquiry:  has the defendant's use resulted in
     any actual association between the defendant and the
     famous mark?

53.  At the outset, the Court notes that this case does not
     center upon Nissan Computer's use of the NISSAN mark in
     connection with the name of its business.  Indeed, Nissan
     Motor has signed a six-party agreement acknowledging that
     it perceives third-party uses of the word "Nissan" in
     connection with the name of certain businesses as
     permissible.

54.  Thus, it does not appear that Nissan Motor is equally
     concerned about all potentially dilutive uses of its mark
     – it has already engaged in self-dilution.  Instead,
     Nissan Motor has focused its attention in this case
     specifically on the use of the mark at <u>nissan.com</u>.

55.  Accordingly, the question presented is whether Nissan
     Computer's use of the NISSAN mark on <u>nissan.com</u> is likely
     to cause dilution by blurring?[16]

56.  To answer this question, the Court begins with an
     examination of modern internet use.  At the end of the
     twentieth century, several courts offered explanations of
     internet use in the context of trademark infringement

---

[16]  As discussed in further detail below, ownership of a
famous mark does not result in automatic entitlement to ownership
of the mark as a domain name; there is no authority for such a per
se dilution rule.  <u>See, e.g.</u>, <u>Hasbro, Inc. v. Clue Computing, Inc.</u>,
66 F.Supp.2d 117, 133 (D. Mass. 1999) (no <u>per</u> <u>se</u> dilution rule in
cyberspace); HQM, Ltd. v. Hatfield, 71 F.Supp.2d 500, 509 (D. Md.
1999) (same).

cases.  <u>See, e.g.</u>, <u>GoTo.com v. Walt Disney Co.</u>, 202 F.3d 1199, 1209 (9th Cir. 2000);  <u>Sporty's Farm v. Sportsman's Market, Inc.</u>, 202 F.3d 489, 492 (2d. Cir. 2000).  It appears there was a common perception that although internet users were slowly becoming more internet-savvy, "the most common method of locating an unknown domain name [was] simply to type in the company name or logo with the suffix .com. . . . [g]iven the state of search engine technology. . . ."[17]  <u>Id.</u>

57.  That perception may have been the reality in 2000, when consumers were only beginning to rely on the internet as an information source.  However, as of 2007, both the internet and its users have become more sophisticated.  Indeed, as the Ninth Circuit observed in this case as early as 2004:

> An internet user interested in purchasing, or gaining information about Nissan automobiles, would be likely to enter <u>nissan.com</u>.  When the item on that website was computers, the auto-seeking consumer would realize in <u>one hot second</u> that she was in wrong place and either guess again or resort to a search engine to locate Nissan Motor's site.

---

[17]  This Court made similar observations in its prior order on summary judgment re: dilution.  (<u>See</u> Order Granting Pls.' Mot. for Summ. J. Re: Nissan Computer Corp Re: Dilution, Aug. 28, 2002 ("8/28/02 Order") at 9-10.)  Those observations, however, were made seven years ago, when the internet was still an emerging technology.

1    _Nissan Motor Ltd.,_ 378 F.3d at 1019 (citing _Interstellar,_

2    304 F.3d at 946) (emphasis added).

3    58.   It is the practice of "guessing again" or "resorting to a

4          search engine" that the Court finds instructive.  As

5          expert testimony indicated, most people with even basic

6          internet familiarity are aware that their initial

7          searches might lead them to the incorrect site.  Thus,

8          they often begin their searches with search engines.

9    59.   In short, because consumers have become more familiar

10         over the past several years with the internet generally

11         and search engines specifically, it seems unlikely that

12         anyone assumes that a company name is necessarily the

13         same as a domain name.  The prevalence and effectiveness

14         of search engines substantially mitigates this

15         consideration.

16   60.   This is especially true when the defendant's site is

17         quite obviously unrelated to the plaintiff's site or its

18         products.  As noted above, Nissan Computer's site is not

19         remotely as sophisticated as Nissan Motor's.  Thus, it

20         takes only "one hot second" for an internet user looking

21         for Nissan Motor to realize that _nissan.com_ is not the

22         site of a very large car company that has spent millions

23         of dollars on high quality advertising.[18]

24

25   _____

26        [18]   By contrast, Nissan Motor's position appears to be that
     those internet users seeking information on cars who mistakenly
27   visit _nissan.com_ are likely to make two inferences:  that 1)
     _nissan.com_ is somehow associated with the highly visible automobile
28   company, Nissan Motor; and 2) it would be futile to use a search
     engine or try another means to locate Nissan Motor's site.

                                   38

61. Significantly – and perhaps consequently – Nissan Motor did not present any evidence that those who had visited nissan.com now associated the NISSAN mark with more than one source, in other words, with a source other than Nissan Motor.[19] As McCarthy notes, "[e]ven the probability of dilution should be proven by evidence, not just by theoretical assumptions about what possibly could occur or what might happen." 4 J. Thomas McCarthy, McCarthy On Trademarks & Unfair Competition, § 24:67 (4th ed. 2006).

62. Nissan Motor could have conducted several surveys to determine whether any dilution by blurring was likely to occur, or had in fact occurred. For example, it would have been very easy to design a survey that asked subjects to visit nissan.com and respond if they thought it was in any way associated with Nissan Motor. That Nissan Motor did not conduct such a simple and obvious survey is a significant omission.

63. Nissan Motor could have also surveyed persons who knew of its famous mark, selecting a group of persons that had been exposed to Nissan Computer's use and a group of

---

[19] Although the TDRA abrogated Moseley's requirement that a plaintiff prove actual harm, the Court notes that evidence of harm is still helpful as an additional means of determining whether dilution is likely to occur as a result of a defendant's accused use. See, e.g., Autozone, Inc. v. Strick, 466 F.Supp.2d 1034, 1044 (E.D. Ill. 2006) (noting that even under the TDRA, "[p]laintiffs . . . still bear the burden or showing at least a likelihood of dilution); Century 21 Real Estate LLC, v. Century Ins. Group, 2007 WL 484555 at *15 (D. Ariz. Feb. 9, 2007) ("[T]he TDRA does not eliminate the requirement that consumers mentally associate the mark used by the alleged diluter with the protected mark.").

1    persons that had not.  The two groups would have been

2    asked the type of product they associate with the NISSAN

3    mark.  The difference between the two groups as to the

4    percentage who identified the mark with Nissan Motor's

5    goods or services might have been representative of the

6    damage to the strength of the mark due to Nissan

7    Computer's use.  See generally P.M. Bible, "Defining and

8    Quantifying Dilution Under the Federal Trademark Dilution

9    Act of 1995: Using Survey Evidence to Show Actual

10   Dilution", 70 U. Colo. L. Rev. 295 (Winter 1999)

11   (providing additional examples of potential dilution

12   surveys).[20]

13   64.  In sum, Nissan Motor's failure to conduct surveys that

14        would actually answer the main question at issue in this

15        case is significant.

16   65.  Notably, many cases cited by Nissan Motor held that

17        "excluding" a trademark owner from the use of its

18        trademark as a domain name was a type of dilution in

19        addition to blurring or tarnishment.  See, e.g.,

20        Panavision, 141 F.3d at 1326 (explaining that to "find

21        dilution, a court need not rely on the traditional

22

23   [20]  Nissan Motor relies on a passage from Moseley to argue
     that because the marks at issue are identical, it can prove actual
24   dilution.  See Moseley, 537 U.S. at 434 ("It may well be, however,
     that direct evidence of dilution such as consumer surveys will not
25   be necessary if actual dilution can reliably be proven through
     circumstantial evidence – the obvious case is one where the junior
26   and senior marks are identical.").  However, this statement is
     dicta, and, as the Ninth Circuit noted on appeal, "it is not
27   entirely clear what the Court meant by this."  Nissan Motor Ltd.,
     378 F.3d at 1015.  Accordingly, the Court will not find that actual
28   dilution has been proven merely because the first TDRA factor
     weighs in Nissan Motor's favor.

definitions such as 'blurring' and 'tarnishment'"). The
Court finds, however, that this idea has been effectively
superseded by: (1) the passage of the federal
Anticyberquatting Consumer Protection Act, 15 U.S.C. §
1125 (d), which provides an explicit remedy against
cybersquatters; and (2) the TDRA, which defines dilution
solely in terms of diluting by blurring or tarnishment.
There is no authority for a per se dilution rule
regarding domain names, and every dilution case must turn
on its particular facts.

66.   Therefore, because there is no per se dilution rule, and
      Nissan Motor failed to present any evidence of actual
      association, the Court finds that this last TDRA factor
      weighs heavily in Nissan Computer's favor.

G.   **Other Considerations**

67.   As noted above, although the TDRA lists six factors
      courts should consider when conducting the blurring
      analysis, these factors are non-exclusive.

68.   Federal anti-dilution law is relatively young and is
      still evolving, and the TDRA has a "sparse legislative
      history." 4 J. Thomas McCarthy, McCarthy On Trademarks &
      Unfair Competition, § 24:96 (2007).  Only a few courts
      have interpreted the TDRA since its enactment, and none
      appear to have applied the TDRA at trial.

69.   Moreover, while there is some indication that trademark
      dilution on the internet was a matter of Congressional
      concern when the original dilution act was passed, see,
      e.g., Panavision, 141 F.3d at 1326 (citing the testimony

41

1    of Senator Patrick Leahy), this concern was largely

2    resolved by passage of the ACPA.  See, e.g., Porsche Cars

3    North America, Inc. v. Porsche.Net, 302 F.3d 248 (4th

4    Cir. 2002) ("We may and do conclude that the enactment of

5    the ACPA eliminated any need to force trademark dilution

6    law beyond its traditional bounds in order to fill a past

7    hole, now otherwise plugged, in the protection of

8    trademark rights.").

9    70.  Finally, Nissan Motor's delay in bringing suit is a

10        significant factor.  Nissan Motor was aware of Nissan

11        Computer's potentially dilutive use on nissan.com as

12        early as mid-1995.  However, Nissan Motor did nothing to

13        stop that use until Nissan Computer posted links to auto-

14        related advertisers on nissan.com in late 1999.  Although

15        this 4.5 year delay may not be long enough to invoke the

16        doctrine of laches,[21] it suggests that, at least during

17        the 1990s, Nissan Motor did not actually believe that

18        nissan.com was diluting its mark.  At trial, Nissan Motor

19        did not offer any justifiable explanation for this 4.5

20        year delay.  Because it is undisputed that owners of

21        famous marks must police their marks, a failure to do so

22        must be considered as part of the dilution analysis.

23  H.  **Balancing the Blurring Factors**

24    71.  At the end of the blurring inquiry, the Court is left

25        with three of six enumerated factors that cut in favor of

26        Nissan Motor, two that are neutral, and one – the most

27

28
    _____

    [21]  Order on Summ. J., 8/28/02, at 32.

1    important one – that cuts strongly in favor of Nissan

2    Computer.

3    72.   The Court is also left with certain considerations that

4          cannot be ignored.  First, the TDRA is a new statute that

5          must be interpreted cautiously and with the principles of

6          dilution in mind.  Second, Nissan Motor failed to enforce

7          its rights against Nissan Computer for 4.5 years without

8          any persuasive explanation of its delay.  Third, the rise

9          of the Googles and the Yahoo!s along with increasing

10         consumer familiarity with the internet substantially

11         mitigate against the risk of domain name dilution.

12         Fourth, consumers who use a search engine to look for

13         information on Nissan Motor will almost immediately be

14         directed to nissanusa.com, and, should they accidentally

15         visit nissan.com, will realize almost immediately that

16         they are at the incorrect site and will therefore

17         continue in their searches.  Fifth, there is no credible

18         evidence that Nissan Computer's use of nissan.com is

19         likely to dilute Nissan Motor's famous mark.  Without

20         such proof, the Court is unwilling to assume that

21         consumers who visit the nissan.com website are likely to

22         associate the NISSAN mark with more than one source.  See

23         J.T. McCarthy, Providing a Trademark Has Been Diluted:

24         Theories or Facts?, 41 Houston L. Rev. 713, 747 (2004)

25         ("I accept that there may be some extraordinary

26         situations in which anti-dilution law can be applicable.

27         But so far, too many courts have viewed anti-dilution law

28         as a quick and easy remedy to be applied whenever

                                  43

dilution theory says that injury to a famous mark might occur. But we know that theory of any kind, whether in physics, medicine, or law, should never be applied in a real world case without some hard evidence to support it. The extraordinary remedy of an anti-dilution law should require evidentiary vigor by the courts.").

73. Finally, the Court reiterates that there is no _per se_ dilution rule in the cyberspace context. Put differently, the rule cannot be that the owner of a famous mark will always be able to enjoin the commercial use of that mark as a domain name. If it were, protection from dilution would no longer "come close" to being a right in gross; such protection would, in essence, _be_ a right in gross. As a sister court in Massachusetts summarized:

> Holders of a famous mark are not automatically entitled to use that mark as their domain name; trademark law does not support such a monopoly. If another Internet user has an innocent and legitimate reason for using the famous mark as a domain name and is the first to register it, that user should be able to use the domain name, provided that it has not otherwise infringed upon or diluted the trademark.

_Hasbro_, 66 F.Supp.2d at 133. Especially in light of the protections now afforded to owners of famous marks by the ACPA, the Court does not believe that Congress intended

1        to grant the owners of famous marks such all-encompassing

2        domain name rights through a per se dilution rule.

3    74.   Accordingly, after carefully considering the specific

4        facts of this case, the Court holds that Nissan

5        Computer's use of the NISSAN mark at nissan.com is not

6        likely to cause dilution by blurring.[22]

7 **III. Nissan Computer's Use of the Mark Is Not Likely to Cause**

8     **Dilution of the Mark by Tarnishment**

9    75.   Dilution by tarnishment is an association arising from

10      the similarity between a mark or trade name and a famous

11      mark that harms the reputation of the famous mark.  See

12      15 U.S.C. § 1125(c)(2)(C).

13   76.   Nissan Motor's tarnishment analysis turns on the idea

14      that exposure to the low-tech advertising and discount

15      products and services on nissan.com is likely to cause

16      consumers to associate the NISSAN mark with inferior

17      products and web content.

18   77.   This analysis, however, suffers the same fatal flaw as

19      Nissan Motor's blurring analysis – it assumes that modern

20      internet users make any association between the visual

21      appearance of or the quality of products on Nissan

22      Computer's website and the attributes they associate with

23      the NISSAN mark.

24   78.   Moreover, as noted above, there was no reliable evidence

25      presented that tarnishment was likely to occur or had in

26

27    [22]  Again, this is not to say that all persons engaging in commercial use of another's famous mark on a website will prevail

28 against dilution claims.  It is possible that a domain name case with different facts could meet the blurring criteria.

1    fact occurred.[23]  There was also no reliable evidence that

2    the products sold on Nissan Computer are in fact

3    "inferior" to those offered by Nissan Motor.

4    79.  Finally, in the "dilution by tarnishment" line of domain

5         name cases, courts have typically found tarnishment only

6         when the potentially tarnishing website leads viewers to

7         an "unwholesome" website.  See, e.g., Mattel, Inc. v.

8         Internet Dimensions, Inc., 55 U.S.P.Q.2d 1620 (S.D.N.Y.

9         2000); (BARBIE tarnished by the diversion of internet

10        users to a website containing pornographic images),

11        Archdiocese of St. Louis v. Internet Entertainment

12        Group.,Inc., 1999 WL 66022 (E.D. Mo. 1999) (marks such as

13        PAPAL VISIT 1999, used to publicize the Pope's visit

14        to St. Louis in January 1999, were tarnished by

15        defendant's use of papalvisit.com and papalvisit1999.com

16        domain names for websites advertising adult entertainment

17        websites); Hasbro, Inc. v. Internet Entertainment Group,

18        Ltd., 40 U.S.P.Q.2d 1479 (W.D. Wash. 1996)(CANDYLAND for

19        children's game held diluted by tarnishment by

20        candyland.com for website showing sexually explicit

21        pictures); Toys "R" Us, Inc. v. Akkaoui, 40 U.S.P.Q.2d

22        1836 (N.D. Cal. 1996) (TOYS "R" US tarnished by use of

23        ADULTS R US as domain name for a website advertising the

24        sale of adult sexual products).

25

26

27

---

28    [23]  See the Court's discussion of Peter Sealey's testimony,
      supra.

46

80.   Here, Nissan Computer did not use the NISSAN mark in
      connection with sexual activity, obscenity, illegal
      activity or any other activity of questionable repute.

81.   Accordingly, the Court concludes that Nissan Computer's
      use of the NISSAN mark at nissan.com is not likely to
      cause dilution by tarnishment.

## IV.   A Permanent Injunction is Not Warranted for Nissan Computer's Infringement

82.   Injunctive relief should not be granted unless there is a
      realistic threat of future violations.  See, e.g.,
      Quechan Tribe of Indians v. Rowe, 531 F.2d 408, 410 (9th
      Cir. 1976) ("The prime prerequisite for injunctive relief
      is the threat of irreparable future harm.").

83.   Although the Court has found that Nissan Computer engaged
      in trademark infringement for a small period in late 1999
      when it posted auto-related advertisements on nissan.com,
      that infringement ceased immediately when Nissan Motor
      filed its complaint in this case nearly eight years ago.

84.   Nissan Motor argues that Nissan Computer later infringed
      its mark by posting a link on the nissan.com site that,
      through a series of links to other websites, led to auto-
      related advertising.  However, the Court finds this use
      too attenuated to constitute infringement.  Moreover,
      Nissan Computer removed these links several years ago,
      and has done nothing since to infringe on the NISSAN
      mark.

85.   Accordingly, in light of Nissan Computer's long history
      of non-infringement, the Court finds that there is no

47

1  realistic threat that Nissan Computer will resume its
2  unlawful conduct and declines to issue the permanent
3  injunction requested.

4

5                          **CONCLUSION**

6      For the foregoing reasons, the Court finds that Nissan
7  Computer's use of the NISSAN mark is not dilutive pursuant to the
8  TDRA.   The Court also declines to issue an injunction permanently
9  enjoining Nissan Computer from engaging in infringing conduct.
10     Entry of judgment pursuant to the findings and conclusions
11 herein is proper under Fed. R. Civ. P. 52(c).   Thus, judgment is
12 hereby GRANTED in favor of Defendants on Plaintiff Nissan Motor's
13 claim for trademark dilution.[24]   Plaintiffs' request for a permanent
14 injunction on its trademark infringement claim is DENIED.

15

16 IT IS SO ORDERED.

17

18

19 Dated:  9 — 20 — 07

20                                     DEAN D. PREGERSON
                                       United States District Judge
21

22

23

24

25

26

27
   _____
28     [24]  NNA is only a plaintiff on the trademark infringement
   claim.

                              48